[EDITOR'S NOTE: This case is unpublished as indicated by the issuing court.] MEMORANDUM OF DECISION
The principle issue in this case is who is responsible for soil contamination and underground storage tanks removal and replacement costs caused by past fuel leakage from an underground storage tank (UST) at an automobile service station. The plaintiffs were tenants in possession who operated a gasoline sale and automobile repair business on the land and buildings owned by the defendant landlord. The plaintiffs claim that the CT Page 10706 landlord is liable pursuant to the terms of the lease and Connecticut case law.[1]
The plaintiffs commenced this action on April 29, 1991, returnable May 14, 1991 in a five count complaint. As of April 1991 the USTs had not yet been removed from the ground, nor did the plaintiffs know the soil was contaminated. The plaintiffs' complaint alleges the following: breach of lease as to maintenance, repair or replacement of the USTs and violation of the implied covenant of good faith and fair dealing (first count); breach of lease as to terminating right to sell gasoline yet still demanding the full lease rent (second count); breach of lease based on defendants' refusal to replace the USTs while insisting that the plaintiffs not use the tanks (third count); intentional interference with the opportunity of plaintiffs to sell the business (fourth count); and vexatious litigation by commencing an eviction action on April 26, 1990 and withdrawing that action on October 19, 1990 (fifth count). To these allegations the defendants filed an answer without special defenses or counterclaims. The fourth and fifth counts were withdrawn on June 17, 1996.
This case is not about: (1) Negligence. Neiditz v. Morton S.Fine Associates, 199 Conn. 683, 688 (1986); (2) Declaratory judgment as per Practice Book § 17-54 et seq., since the plaintiffs withdrew that claim for relief on June 17, 1996; (3) Environmental liability pursuant to General Statutes §22a-451 and indemnification pursuant to General Statutes §22a-452 for expenses incurred in mitigating the effect of contamination. Connecticut Resources Recovery Authority v. RefuseGardens, Inc., 229 Conn. 455 (1994); (4) Federal environmental responsibility and indemnity under Comprehensive Environmental Response, Compensation and Liability Act (CERCLA) 42 U.S.C. § 9601
et seq.; (5) Indemnity under the Connecticut Underground Storage Tank Petroleum Clean Up Fund Act; Regs., Conn. State Agencies § 22a-449e-1 et seq.; or (6) Liability under the Connecticut Transfer Act; General Statutes §22a-134 et seq.; or (7) Injunctive remedies to abate pollution under the Connecticut Water Protection Act; General Statutes §22a-435 et seq.
 PROCEDURAL ISSUES
The parties, in open court, on April 6, 1999, stipulated as follows: (1) the matter is submitted to the court based upon the CT Page 10707 pleadings as amended through September 1997; (2) the transcripts from the ten days of trial will be considered by the court in lieu of testimony, if required by the court; (3) all the exhibits currently in the file are all the exhibits previously submitted; (4) the court may consider those exhibits; (5) no further exhibits, documents or witnesses will be offered by either party; (6) if the court finds that the matter may not be completed without prejudice to the parties, the court has the right to declare a mistrial; (7) no request will be made by the parties to recall any witnesses; (8) no other steps are reasonably necessary to complete the proceedings; (9) the court has the right, upon its review of the file, transcripts and exhibits, to call its own witnesses; (10) the trial judge will render a decision based upon his own findings of fact and conclusions of law; and (11) no further trial briefs will be submitted.
The court has read the trial notes, the pleadings, memoranda of law as well as the exhibits. The court declines to declare a mistrial or call any court witnesses. The court finds the following procedural facts:
No further proceedings are necessary and the matter may be completed without prejudice to the parties. No other steps are reasonably necessary to complete the proceedings. This decision is based on this court's own findings of fact and conclusions of law. There is no need to review the trial transcripts since this court reviewed its extensive notes. Connecticut National Bank v.Giacomi, 242 Conn. 17, 23 n. 11 (1997); General Statutes §§51-183b, 51-183c, 51-183f; Stevens v. Hartford Accident Indemnity Co., 29 Conn. App. 378, 386 (1992); Sanchez v. Prestia,29 Conn. App. 157, 161 (1992); Holcombe v. Holcombe,22 Conn. App. 363, 365 (1990); State v. Douglas, 10 Conn. App. 103, 119
(1987); Barone v. O'Connell, Superior Court, judicial district of Fairfield at Bridgeport, Housing Session, Docket No. CVBR 9407-02447, (December 13, 1995, Tierney, J), aff'd, 43 Conn. App. 913
(1996).
 FACTS
After hearing the evidence, the court makes the following findings of fact. In 1980 Joseph DeFrancesco purchased land, buildings and improvements at 1335 Hope Street, Stamford, Connecticut, on which he thereafter operated a general automotive repair and a gasoline sales business. He decided to sell the business. On April 25, 1985 Mr. DeFrancesco negotiated, prepared CT Page 10708 and executed a gasoline station lease agreement, leasing the premises to the plaintiffs, Ricky DeVito and Frank DeVito, d/b/a. Precision Auto Center. The lease is Exhibit 1. He sold his existing business to the plaintiffs on the same date for $90,000.00. The lease ran for five years from May 1, 1985 through April 30, 1990. The tenant was given the option to extend and renew this lease for an additional five years. For the first five years the monthly rent was $2,500.00. The rent for the second five years contained a cost of living increase. The plaintiffs timely exercised their five year option in 1990.
The gasoline service station had been constructed many years before by Sun Oil Company, who ran a gasoline service station at that location. The gasoline was stored in underground storage tanks (USTs) and pumped through the usual above ground facilities into the motor vehicles that were being serviced. This court counted nine tanks on the property from a diagram in evidence, yet the parties refer in their Memoranda to a lesser number. This difference is not significant. There were no state UST regulations in effect in 1985. UST regulations were first promulgated in Connecticut effective November 1986.
At some time prior to Joseph DeFrancesco obtaining title to the property, one of the gasoline tanks sustained a leak. Sun Oil Company took that tank out of service, sealed it, leaving the tank in the ground and no longer using it for fuel storage purposes. This fact was disclosed by Sun Oil Company to Joseph DeFrancesco when he purchased the property and in turn by the defendant to the plaintiffs when they acquired the lease to the property. The plaintiffs took possession of the property, operating not only the gasoline dispensing side of the business, but conducting automotive repairs.
Joseph DeFrancesco died on March 4, 1990. Carol DeFrancesco, the widow of Joseph DeFrancesco, was duly appointed, and at all times was acting as, the executrix of the estate of her late husband. The word "defendant" will refer interchangeably to Mr. DeFrancesco and his Executrix. She had been managing the property since October 1989, when her husband's illness prevented him from managing the property as landlord. Prior to October 1989, she had only minimal paperwork involvement in this business. She hired her current trial attorney, Paul McCullough, a month before her husband's death. Prior to that, she and her husband had been represented Attorney Louis Volpintesta. She did not become aware of the other governmental requirements of UST's, other than CT Page 10709 registration until spring 1991, when Mr. McCullough advised her of the UST removal requirement.
The plaintiffs first became aware of the UST registration requirement in late 1989 from their former attorney A.J. Barr. Attorney Barr gave the plaintiffs a state form, which they took to Mr. DeFrancesco. Mr. DeFrancesco told the plaintiffs that he did not know the age of the tanks. This information was required for the completion of the state UST form.
After plaintiffs were not able to learn the age of the USTs from Mr. DeFrancesco they went to various municipal offices in Norwalk including the fire department. The results were negative. They paid Attorney Barr to research the issue. Again, no age of the tanks could be determined. At the same time, the plaintiffs attempted to sell the business, but only if Mr. DeFrancesco would pay his share of the costs of replacing the USTs as per paragraph 8(a) of the lease. The defendant told the plaintiffs that he did not want to suffer out of pocket expenses and proposed a three way sharing of the tank replacement cost in the following manner: (a) the lease would be extended; (b) the fuel oil supply company would do the tank replacement job at its own cost and would charge an additional few cents per gallon to the prospective buyer; and (c) the plaintiffs would reduce the sales price of the business to the prospective buyer. With this concept agreed on, a prospective purchaser, V. F. was obtained in late 1989 by the plaintiffs, but for reasons not offered at trial, this sale never took place. A contract of sale between the plaintiffs and V. F. was dated October 20, 1989.
The defendant testified that she first became aware of the Connecticut requirement of registration of all underground storage tanks a few months prior to her husband's death. She tried to obtain the age of the USTs. She spoke to her sons and other service station employees who worked during the years 1982 to 1985. She examined her husband's files. Her attorney contacted state authorities to see if there was any evidence of the age of the tanks. She asked the plaintiffs. She never had any discussions with her husband concerning the age of the USTs. Prior to March 4, 1990, neither Mr. nor Mrs. DeFrancesco was aware of any governmental registration requirement for USTs. As a result of this extensive investigation the defendant was not able to ascertain the age of the USTs.
In early 1990 before her husband's death, Carol DeFrancesco CT Page 10710 discussed with the plaintiffs having their current fuel provider, Mercury Fuel Service, or the former provider, Sun Oil Company, perform the UST replacement at the cost of the fuel supply company with the tenants paying an additional few cents per gallon charge with no reimbursement or rent reduction by the landlord. Sun Oil Co. supplied gasoline to the plaintiffs from May 1, 1985 until May 31, 1986 and Mercury Fuel Service thereafter. She threatened eviction if the plaintiffs did not agree. A rent check had just been returned for insufficient funds. The UST replacement offer was rejected by Sun Oil Co. on the basis that the defendants were not willing to sufficiently extend the lease termination date. The plaintiffs countered by obtaining three separate estimates in early March 1990 for the fuel tank removal and replacement and sent them to the defendants' attorney. All estimates excluded any cost to remove contaminated soil. The estimates were as follows: Exhibit 2, Kaufman Pump Tank Inc., $59,700.00; Exhibit 3, Kessler Installation Corp. $59,030; and Mallozzi Construction Co. Inc., $156,000.00.
The plaintiffs, by counsel, informed the defendant in January 1990 that they were ready to pay their share of the removal and replacement cost under paragraph 8(a) of the lease. The defendant responded that the tenant's share was 50%. The defendants started an eviction action in April 1990 and later withdrew the eviction action in October 1990. The defendants' 50% demand included the soil contamination remediation, if any, UST removal and UST replacement. The plaintiffs said they were responsible only for 40% of the UST removal and replacement since the tank removal and replacement would occur after May 1, 1990 during the 6th year of the lease and the tenant's obligation under the lease had been reduced by 10%. The plaintiffs also told the defendant that the tenants did not cause the problem and the lease did not provide for contaminated soil remediation. The plaintiffs took the position that they were responsible for no more than 40% of the UST removal and replacement cost under paragraph 8(a). The defendant admitted in Exhibit 15 that there were no fuel leaks on the site during the plaintiffs' occupancy.
This court, concludes that neither the plaintiff nor the defendant had any evidence of the age of the USTs. In 1986, Connecticut law changed and required registration of all USTs including commercial gasoline service stations. In order to comply with the registration requirements and to permit the USTs to continue, the age of each UST had to be verified and filed CT Page 10711 with the state. The policy of Connecticut was that if the age of a UST was not clearly established, it was assumed the UST was over 20 years old. Any UST more than 20 years old had to meet more stringent requirements. None of the USTs at 1335 Hope Street met those requirements. Therefore, Connecticut required that all USTs over 20 years old or of undetermined age be placed out of service and removed from the ground, along with the removal of any contaminated soil. No new USTs could be installed until these requirements were satisfied. In the meantime no fuel could be sold from "out of service" USTs.
This is in fact is what happened. The UST registration requirements could not be met by either party. Since the age of the USTs were undetermined, the state required the USTs to be taken out of service. On March 6, 1991, Attorney Paul McCullough, acting for the defendant, informed the plaintiffs that the state regulations required that the plaintiffs either bring the USTs up to code or take them out of service. Exhibit 6. The plaintiffs took the USTs out of service on April 19, 1991. It was first learned by the parties in May 1991, when the USTs were removed, that the soil had been contaminated. There was no evidence at trial that any fuel (gasoline, oil or other petrochemical products) stored or sold by the plaintiffs, had leaked. The plaintiffs consistently throughout the lease, measured all operating tanks daily to determine whether there was any leak. They compared the reading in the tanks with the pump readings and noted the results in a daily ledger book. This measurement program disclosed that there were no fuel leaks that occurred during the period of the plaintiffs' occupancy of the property. Further there was no evidence of any fuel leaks that occurred during the defendants' ownership and occupancy of the property. No evidence was offered at trial as to the age of the USTs. The purchase agreement dated April 25, 1985, Exhibit 5, paragraph 25, states "five operable tanks presently located on the premises are more than eleven years old." A deed was offered into evidence showing that Gulf Oil Corporation purchased the property from the Independent Oil Company of Connecticut, Inc. on January 15, 1947. The deed was recorded on January 27, 1947 in the Stamford land records. An inference can reasonably be drawn that all five fuel storage tanks were in the ground for more than 50 years. The parties signed a purchase contract for the business in addition to the lease. Both parties knew that one tank had leaked prior to their respective occupancies. Exhibit 5, paragraph 25 of the April 25, 1985 purchase contract stated: "except, for one tank which had previously leaked and had been sealed off by Sunoco." CT Page 10712
From April 19, 1991 to the end of the lease on April 30, 1995, the plaintiffs were not able to sell gasoline. They continued to occupy the premises repairing automobiles. The March 6, 1991 letter stated "Mrs. DeFrancesco is moving expeditiously to contract for the removal of these tanks." Exhibit 6. After the tanks were removed by the defendant and the soil contamination discovered, the defendants' attorney wrote the following to the plaintiffs' attorney on July 9, 1991: "My client will be making application to the Underground Storage Tank Petroleum Clean-Up Fund Review Board for financial assistance." Exhibit E. In fact, the defendant did not apply to the Board until May 19, 1993.
Exhibit 1, the April 25, 1985 lease signed by the parties, has not been modified. There is a cost sharing provision in paragraph 8(a), which states as follows: "The Landlord and Tenant agree to the following maintenance obligations concerning the premises: (a) The Landlord and Tenant shall share equally in the cost of any maintenance, repair, or replacement of the underground storage tanks during the first five year period of the lease. Thereafter, the Tenant's maintenance obligation regarding the tanks shall be reduced by 10% per year, such reduction to be pro rated for any portion of any such year." The plaintiffs invoked this clause of the agreement and indicated again their willingness to pay 40% of the costs of the removal of the underground storage tanks, and the installation of new underground storage tanks so that the gasoline sales portion of business could reopen. The plaintiffs estimated the total cost and tendered to the defendant 40%, but indicated orally to the defendant that they were willing to tender the full 50%. The defendant, in March 1991, obtained an estimate of $62,000.00 for the removal of the tanks and reinstallation of new tanks from C 
P Excavating, and sent it to the plaintiffs. The work was to be performed in May 1991. On April 18, 1991, the plaintiffs tendered a check to the defendant for 40% of the C P estimate $24,800.00. The plaintiffs did not consider any cost for removal of soil contamination. At the time of this tender neither party was aware of any contaminated soil. The $24,800.00 check was not accepted by the defendant.
The defendant, at that time, claimed that the plaintiffs had the obligation to pay for and maintain the entire property pursuant to the lease and thus had to assume the entire UST repair and replacement cost. She demanded that the tenants make the full payment in accordance with the lease terms. She cited CT Page 10713 paragraph 9 of the lease which states, "The Tenant shall, at its expense, maintain the station in good, safe and operating condition and shall promptly make all repairs or replacements necessary for that purpose, with the exception of those maintenance obligations set out in Article 8 above." The defendant also relied on paragraph 14 of the lease; "The Tenant shall promptly comply with all present and future laws, orders and regulations of all governmental authorities with respect to the service station premises and the operation of a gasoline and repair facility at the location and regarding any other permitted activity which the Tenant shall engage in."
"The provision . . . requiring unconditional compliance with present and future laws and ordinances, envisages the possibility of regulatory change. Although the parties might well have incorporated into that clause a methodology for joint amelioration of the impact of regulatory change, the fact remains that they did not do so. It is hornbook law that courts do not rewrite contracts for the parties." Heyman v. CBS, Inc.,178 Conn. 215, 227 (1979).
The defendant's reasoning was that the obligation for the removal of the UST was neither the fault of the plaintiffs nor the defendant and was not caused by any of their activities. There was no evidence to indicate that either party knew of any continuing leaks on the property during the period of time that either the the defendant or the plaintiff operated a gasoline service states on the premises. The landlord further claimed at that time that since the state required the removal of the tanks, paragraph 14 is a tenant's obligation and trumps any landlord contribution under Paragraph 8(a). The plaintiff naturally disagreed and claimed that the maximum amount of their possible liability is half the cost of the UST tank removal and replacement. The defendants also claimed at that time that paragraph 33, which states that under no circumstances shall Landlord be liable to Tenant for any acts or omissions of Landlord, is an absolute defense to the plaintiffs' claim. Paragraph 33 does except from its effect, "the maintenance obligations set out in Article 8 of this Lease." Finally the defendant claimed at that time that the "as is" clause of paragraph 37 should be invoked to shield the defendant from liability since the tenant had actual knowledge of all five underground tanks, one of which was not in use due to prior leaks, all prior to signing the April 25, 1985 lease. CT Page 10714
The defendant did not have the remaining money for the tank replacement. Her husband's illness left her family destitute. There were substantial mortgages on their various real properties, all in arrears. Her husband's estate was settled as an insolvent estate. She had an annual salary not exceeding $24,000.00 and no other source of income. This court is satisfied of that fact after review of her financial documents at trial. The defendant could not afford to fulfill her lease obligation to remedy the UST problem. Defendant only had enough money to provide C P a small down payment on the cost of excavating the old tanks and removing them. This left holes in the ground, damaged asphalt, and loose dirt. The holes were not filled in. Exhibit 7 and 8. The plaintiffs did not pay for the excavation. The parties only found that the soil was contaminated at the time of the tank removal. She told the plaintiffs that she could not finish the job because she could not afford to remove the contamination nor pay for her share of the tank installation. She had only sufficient money to pay to C P Excavating $9-10,000.00 on account of the removal of the old tanks. At trial she still owned C P Excavating the balance of the excavating and removal bill of $22,176.00, which is now secured by a mechanics lien, dated November 26, 1991, filed by C P Excavating on the service station property at 1335 Hope Street. Exhibit Q. There was no evidence of any court action commenced enforcing the C P Excavating claim.
After the May 1991 discovery that the soil was contaminated, no tender was made by either party of any portion of the costs of soil removal. Just before the tank removal and the resulting discovery of the soil contamination, the plaintiffs commenced this suit on April 29, 1991. The principle claim at that time was that the defendant landlord breached paragraph 8(a) of the lease by failing to pay her 50%.
The plaintiffs attempted to mitigate their damages once the soil contamination was discovered in order to recommence gasoline sales. They attempted to pay for the entire cost of the tank replacement providing the lease was extended on favorable terms. This offer was not accepted by the defendant. They attempted to sell the business. The plaintiffs filed a Motion for Rent Abatement on June 7, 1991. The motion was granted on August 1, 1991 pursuant to the parties stipulation and the rent was reduced throughout the remaining term of the lease. This rent abatement was due to the inability of the plaintiffs to sell gasoline. The monthly rent was reduced substantially to $1500.00 and the CPI CT Page 10715 increase was forgiven. The plaintiffs wanted to stay in the premises to keep their $90,000.00 purchase investment and to have the court order the defendant make the repairs at her own cost. Thus, the plaintiffs sought to be compensated by ordinary damages.
The plaintiffs offered evidence to show loss of income because they were not able to sell fuel. They produced their books and records to demonstrate their fuel sale profits since 1985. They seek monetary damages of $75,000.00 lost profit from the sale of gasoline. In addition, the plaintiffs claim attorney's fees for the breach of the lease under paragraph 41.
Since the contaminated soil was not removed, the UST's were not replaced during the plaintiffs' tenancy. It was estimated that the cost to remove the contaminated soil was over $100,000.00, a sum neither party could pay. Thereafter, the parties entered into discussions. They attempted to negotiate a new lease in which there would be a sharing of the cost of soil removal in which the installation of new tanks would be paid for largely by a fuel supply company and the landlord would reduce the rent in an extended lease. These lease negotiations did not come to fruition.
After the plaintiffs vacated the premises on the expiration of the lease, on April 30, 1995, the defendant was able to obtain from the state of Connecticut's Underground Storage Tank Petroleum Clean-Up Fund Review Board, necessary funds for the removal of contaminated soil. Her first application dated May 16, 1993, was denied in February 1994. This 1993 application was one of the first applications to the Board. Since October 4, 1991, the Board's regulations permitted either reimbursement or direct payment. "Upon authorization of the board, the commissioner shall reimburse the applicant for authorized costs or make payment to vendors for services rendered." Regs., Conn. State Agencies §22a-449e-1 (g)(I). Until 1995, the Board only reimbursed for funds actually paid for removal of contaminated soil. After the denial its policy changed and the Board was authorized to advance funds for removal. Until Spring 1995, the Board only authorized reimbursements if the USTs had not been properly registered. The policy of the Board then changed. She had reapplied in the Spring of 1994. A few months later, the application was approved. She then awaited a policy change. The defendant removed the contaminated soil in July 1995, paid for entirely by state funds in the amount of $87,200.00. The plaintiffs are not seeking to CT Page 10716 reoccupy the premises. Sun Oil paid $25,000.00 for the new replacement tanks and no doubt is recouping this cost from the new tenant in occupancy on a per gallon basis. The defendant still owns the property and is renting it to a tenant who is conducting a gasoline sales/automotive repair business at the site. The defendants paid nothing for the contaminated soil removal and she has no obligation to reimburse the state.
The plaintiffs claim that the defendant is liable for the following reasons: (1) He did not come up with the remainder of the $62,000.00 tank replacement money under paragraph 8(a); (2) The removal of the contaminated soil is the landlord's responsibility under the lease; (3) The landlord did not promptly apply to the Connecticut Underground Storage Tank Petroleum Clean-Up Fund Review Board; (4) The landlord failed to use best efforts to raise the money considering other assets; (5) The landlord failed in good faith to renegotiate the lease thus allowing a gasoline supply company to solve the UST problem, and (6) The landlord had the common law duty to replace the USTs and remove the soil contamination under Thomas v. Roper,162 Conn. 343 (1972).
The defendant counters by citing the tenant's obligation under the lease: (1) Paragraph 33 provides: "The Landlord shall not be liable for any damage or injury to any property or person at any time on said premises. . . ." The plaintiffs counter by citing the last sentence of paragraph 33: "This provision shall not affect in any way, the maintenance obligations set out in Article 8 of this Lease."; (2) The "as is" clause of paragraph 37 is cited by the defendants and the exception language is cited by the plaintiffs: "Tenant shall examine the said premises before taking possession, and Tenant's entry into possession shall constitute conclusive evidence that as of the date thereof, the said premises were in good order and satisfactory condition, subject to, and except for, that certain agreement entered into regarding the testing of underground tanks for storage of gasoline."; (3) Paragraph 9 of the lease: "The Tenant shall, at its expense, maintain the station in good, safe and operating condition and shall promptly make all repairs or replacements necessary for that purpose, with the exception of those maintenance obligations set out in Article 8 above."; (4) Paragraph 14 of the lease: "The Tenant shall promptly comply with all present and future laws, orders and regulations of all governmental authorities with respect to the service station premises and the operation of a gasoline and repair facility at CT Page 10717 the location and regarding any other permitted activity which the Tenant shall engage in."; (5) The plaintiffs failed to mitigate their damages; (6) The plaintiffs' claims of damages is speculative, inaccurate and not proven; (7) The defendants have no obligation to make a financial contribution due to impossibility of performance caused by their fiscal circumstances; and (8) Under Thomas v. Roper, the tenants are responsible for the conditions of the premises subject only to a fifty percent (50%) portion of the tank removal and replacement costs pursuant to paragraph 8(a) of the lease.
 DISCUSSION OF LAW
One of the issues raised in the remaining three counts of breach of lease involves the interpretation of a written lease. "In construing a written lease, which constitutes a written contract, three elementary principles must be kept constantly in mind: (1) The intention of the parties is controlling and must be gathered from the language of the lease in the light of the circumstances surrounding the parties at the execution of the instrument; (2) the language must be given its ordinary meaning unless a technical or special meaning is clearly intended; (3) the lease must be construed as a whole and in such a manner as to give effect to every provision, if reasonably possible."Peter-Michael, Inc. v. Sea Shell Associates,244 Conn. 269, 275 (1998); see also Lonergan v. Connecticut Food Store,Inc., 168 Conn. 122, 128 (1975).
"Although ordinarily the question of contract interpretation, being a question of the parties' intent, is a question of fact . . . where there is definitive contract language, the determination of what the parties intended by their contractual commitments is a question of law." (Citations omitted.) Levine v.Massey, 232 Conn. 272, 277-78 (1995). "A contract must be construed to effectuate the intent of the parties, which is determined from the language used interpreted in light of the situation of the parties and the circumstances connected with the transaction . . . The intent of the parties is to be ascertained by a fair and reasonable construction of the written words and . . . the language used must be accorded its common, natural, and ordinary meaning and usage where it can be sensibly applied to the subject matter of the contract. . . . Where the language of the contract is clear and unambiguous, the contract is to be given effect according to its terms. The court will not torture words to import ambiguity where the ordinary meaning leaves no CT Page 10718 room for ambiguity. . . . Similarly, any ambiguity in a contract must emanate from the language used in the contract rather than from one party's subjective perception of the terms. . . ."Southeastern Conn. Regional Resources Recovery Authority v. DPUC,244 Conn. 280, 291 (1998).
This is a commercial lease. Damages caused to a leased premises and a landlord's possible responsibility therefore, are controlled by a set of rules established in 1972. Thomas v.Roper, supra, 162 Conn. 343. "It must be established that the premises were rendered untenantable without the fault or neglect of the lessee. In the absence of a statute or covenant to the contrary, the lessor does not have a duty to keep in repair any portion of the premises leased to and in the exclusive possession and control of the lessee. . . . Rather, the duty to make ordinary repairs rests on the lessee and § 47-24 does not alter this duty in the absence of the lessor's promise to the contrary." (Citations omitted.) Id., 348.
"In general, there is no implied warranty of habitability given to a tenant, but rather, he takes the premises as he finds them and bears the risk of any defective conditions which are within the area under his exclusive possession and control. . . . This rule, however, does not apply to defects which are the result of faulty design or disrepair and which existed at the beginning of the tenancy, were not discoverable by the tenant on reasonable inspection, and were known, either actually or constructively, to the landlord." (Citations omitted.) Thomas v.Roper, supra, 349-50; see also Gore v. People's Savings Bank,235 Conn. 360, 374 (1995).
Under the rule of Thomas v. Roper, it is the tenant's sole responsibly to repair and maintain the premises unless: (1) a statute passes certain responsibility to the landlord; (2) the landlord by a lease covenant assumed specific repair and maintenance responsibilities; (3) the landlord committed a tort and caused the defect; or (4) there were defects which are the result of faulty design or disrepair that existed of the beginning of the tenancy, were not discoverable by the tenant on reasonable inspection and were known, either actually or constructively, to the landlord. Thomas v. Roper, supra,162 Conn. 350. There is no evidence of any statutory obligation requiring the landlord to repair or replace the USTs. The two boilerplate paragraphs of the lease, 9 and 33, obligate the tenant to make repairs. There is no evidence that the landlord CT Page 10719 caused the defect. The court will discuss the lease covenant of paragraph 8(a) and the fourth itemized exception under Thomas v.Roper in a later portion of this decision.
Connecticut adopted the Resource Conservation and Recovery Act of 1976 (42 U.S.C. § 6901 et seq.) in General Statutes §§ 22a-448 to 22a-454. General Statutes § 22a-449 (c) authorized the Commissioner of Environmental Protection to "establish such programs and adopt, in accordance with chapter 54, and enforce such regulations as he deems necessary to carry out the intent of . . . sections 22a-448 to 22a-454." P.A. 82-233. That section of the statute was amended in 1982 authorizing the Commissioner to adopt regulations governing nonresidential underground storage of oil and chemicals. The regulations in effect at trial were effective June 30, 1994. No history of the regulations was offered at trial. Under the regulations the gasoline service station in question is "non-residential." The plaintiffs, as tenants in possession, are "operators" (operator "means the person or municipality in control of, or having responsibility for, the daily operation of a facility"), and the defendants are "owners" (owner "means the person or municipality in possession of or having legal ownership of a facility"). Regs., Conn. State Agencies § 22a 449(d)-1(a)(2). Both the "operator" and the "owner" have an obligation to comply with the requirements of the "control of the non-residential underground storage and handling of oil and petroleum liquids." Regs., Conn. State Agencies § 22a-449 (d)-1.
The regulations contain reporting obligations. "By May 8, 1986, the owner or operator of each existing facility shall notify the commissioner and the office of the local fire marshal of the results of the life expectancy determination required by subsection (h)." Regs., Conn. State Agencies § 22a-449
(d)-1(d)(I). Neither party notified the commissioner or the local fire marshal. These regulations were not in effect when the lease was signed in April 1985.
In addition the regulations contained an outside date for the use of non-conforming USTs. "No owner or operator of an existing facility shall use or operate any underground component of that facility beyond September 1, 1989, or for longer than five years beyond its life expectancy as determined in accordance with subsection 22a-449 (d)-1(h) of these regulations. . . ." Regs., Conn. State Agencies § 22a-449 (d)-1(e)(2). Since the USTs age could not be determined the USTs had to be placed out of use CT Page 10720 by September 1, 1989. Regs., Conn. State Agencies § 22a-449
(d)-1(h)(2).
"Every contract imposes upon each party a duty of good faith and fair dealing in its performance and its enforcement." Restatement (Second), Contracts § 205. This obligation binds a tenant under a written lease to that duty. Central New HavenDevelopment v. La Crepe lnc., 177 Conn. 212, 217 (1979). This obligation binds a landlord under a written lease to that duty.Warner v. Konover, 210 Conn. 150, 154 (1989).
 CONCLUSION
The parties entered into pre-lease negotiations concerning the conditions of the USTs. The court finds credible the testimony of the plaintiff Ricky DeVito, that paragraph 8(a) was inserted into the lease due to the plaintiffs' concerns that the age and condition of the USTs were unknown. Even though paragraph 9 of the lease put the maintenance obligations on the tenants, and paragraph 33 put the liability obligations on the tenants, Ricky DeVito wanted it to be shared by Joseph DeFrancesco. This is why paragraph 8(a) was added to the lease. The plaintiffs did not want to be entirely responsible for the conditions of underground fuel storage tanks they knew nothing about.
Paragraph 8(a) requires equal contribution for the "maintenance, repair or replacement" of the UST's during the first five years of the lease. The tenants claim the removal of the soil contamination is not part of their lease obligation nor did they cause the contamination. The plaintiffs argue that the demand that they pay one half of the unknown contaminated soil removal if any, was a violation of the landlord's implied covenant of good faith and fair dealing as well as a violation of the specific lease language. As the facts eventually played out, no UST replacement could be accomplished in conformity with governmental codes and regulations without removal of the contaminated soil. Although removal of contaminated soil may not have been in the contemplation of the parties to the lease in April 1985 its language is sufficiently broad to encompass in "replacement," all the work necessary at the site to reinstall new USTs including removal of contaminated soil. The landlord's demand for a tenant percentage contribution for soil removal was not in violation of the lease language.
On April 25, 1985, the parties signed a tank testing CT Page 10721 agreement. Exhibit A. $25,000.00 held in escrow at the closing. Paragraph 3 stated: "It is expected that all leaks will have to be filled with gasoline in order to conduct the tests." Since the tank capped by Sunoco was out of service, the court must assume that this capped tank was not tested. Thus the parties agreed not to test the one tank that had leaked in the past. Exhibit B, page 10, tank marked "Dead 4,000." Paragraph 4 of Exhibit A stated, "The Seller shall be liable for any repairs which may be necessary as evidenced by the testing in order to bring the underground storage tanks into compliance with all federal, state and local regulations pertaining to such underground storage facilities." Paragraph 5 of Exhibit A provided that if the $25,000.00 is not sufficient to remedy the repairs, the tenants can withhold rent and/or promissory note payments. Paragraph 8 of Exhibit A states, "Until the satisfactory completion of all necessary tests, and, if necessary, repairs to the underground storage tanks, the Seller shall hold the Buyer harmless." There was no survival clause. The lease was signed the same day, on April 25, 1985, to be effective May 1, 1985. It, therefore, was in the party's contemplation that this agreement, Exhibit A, would survive the closing and the post closing tank testing results. Ricky DeVito wanted the tanks to be in operating condition and the $25,000.00 escrow fund was to secure any repairs. Paragraph 7(c) of Exhibit A confirms that intent: "If necessary repairs exceed the escrow amount, then all such necessary repairs shall be the sole responsibility of the Seller." The tests were done. No current leaks were noted. The evidence does not disclose if the prior leaks and soil contamination would have been discovered by these tests nor did the tests reveal the age of the USTs.
Exhibit A, the tank testing agreement signed on April 25, 1995, indicated that both parties knew that there was a fuel tank shutdown by the Sun Oil Company. This agreement was prepared by the defendant. There is no evidence whatsoever to indicate that the plaintiffs knew that the shut down tank had caused any contamination of the soil. The plaintiffs had no knowledge of any contamination of the soil until 1991. Just prior to the lease renewal date in 1990, Joseph De Francisco told the plaintiffs that the capped tank had leaked approximately 100 gallons per day. Thus, the landlord knew or should have known of substantial fuel leakage into the soil prior to signing the lease and purchase agreements in April 1985. He failed to disclose this fact to the plaintiffs until 1990. CT Page 10722
Ricky DeVito testified that he did not discuss paragraph 14 of the lease with Mr. DeFrancesco, and his lawyer assured him it was boilerplate. Paragraph 9 is the tenant's repair clause and paragraph 14 is the tenant's legal compliance clause. It appears to this court that paragraphs 9 and 14 are boilerplate. Paragraph 8, the last sentences of paragraphs 33 and 37, as well as the last phrase in paragraph 9, seem to be specifically negotiated by the parties and deal with the unique facts relating to the premises. Paragraphs 8(a), and the last section of paragraphs 9, 33, and 37 thus control over that of any conflicting boilerplate language. Holly Hill Holdings v. Lowman, 226 Conn. 748, 756
(1993).
The UST regulations also require disclosure of the "status of the facility with respect to compliance with these regulations" whenever "an owner or operator shall transfer ownership, possession or control of any new or existing facility. . . ." Regs., Conn State Agencies § 22a- 449(d)-1(f)(1). This transfer notice obligation, if in effect on April 30, 1985, would have bound the defendant Joseph DeFrancesco to disclose and notify the plaintiff of the true facts, i.e., that a tank had leaked 100 gallons per day. Although this regulation was not in effect, the court finds that the defendant did not disclose to the plaintiffs until 1990 the fact that the capped UST leaked 100 gallons per day at some time in the past. Had the plaintiffs had that information they could have protected themselves by: (I) not purchasing the business; (2) adding a contingency clause on removal of any soil contamination; (3) perform soil testing prior to the closing; (4) negotiate a future cost sharing provision in the lease as to soil contamination requiring the landlord to absorb a greater percentage of the cost; and/or (5) obtaining assurance from the landlord that he had the financial ability to pay for contaminated soil removal. This nondisclosure, though not in violation of the UST regulations, is further evidence of the defendants' violation of the implied covenant of good faith and fair dealing.
The fact that a party negligently concealed the existence of unused underground gasoline storage tanks has been held sufficient for a court to order recission of a conveyance.Diamond v. Marcinek, 32 Conn. App. 828 (1993) remanded by Diamondv. Marcinek, 226 Conn. 737 (1993). Diamond involved a 1987 property conveyance in which USTs, unused since 1944, were located, known to the seller and not disclosed to the purchaser. The court invoked the transfer disclosure requirements of Regs., CT Page 10723 Conn. State Agencies § 22a-449 (d)-1(f)(1). The violation of that disclosure supported a private right of action for recission. It also supports a private right of action for damages. Holly Hill Holdings v. Lowman, supra, 226 Conn. 748
(1993).
Since the real injury in this case is the soil contamination, the issue is who can be held responsible for environmental contamination existing prior to the effective date of regulations. This issue was decided in 1996 when a seller of polluted property was held liable under the terms of sale for the cost of excavating contaminated soil. 24 Leggett Street Ltd.Partnership v. Beacon Industries, Inc., 239 Conn. 284 (1996). InLeggett the seller falsely represented in the contract of sale that there were no hazardous substances on the property as defined by CERCLA and any applicable Connecticut statutes and regulations.
In the present case, the defendant unfairly failed to disclose the information he possessed about the extent of the prior leaks. The parties negotiated the circumstances of a possible UST removal even before the imposition of the UST 20 year age removal restriction. Paragraph 8(a) requires both parties to pay one half of the costs. This disclosure put the plaintiffs in the following position just prior to the 1990 lease renewal: If they failed to renew the lease they would walk away from their $90,000 investment and other capital improvements. The plaintiffs could not sell the business at that time without the tank replacement and the defendant did not come up with his share of the UST replacement cost to assist in the sale of the business. Neither party knew that the soil was contaminated and its $100,000 plus removal cost. This removal cost was beyond either party's financial ability.
The defendant argues that the "as is" clause of the lease, is a complete defense to the plaintiffs' claim: "Tenant shall examine the said premises before taking possession, and Tenant's entry into possession shall constitute conclusive evidence that as of the date thereof, the said premises were in good order and satisfactory condition, subject to, and except for, that certain agreement entered into regarding the testing of underground tanks for the storage of gasoline." Exhibit 1, paragraph 37. "A party who purchases property "as is" could not thereafter maintain a claim based on an alleged nondisclosure of known facts." Gibsonv. Capano, 241 Conn. 725, 733 (1997); Holly Hill Holdings v.CT Page 10724Lowman, supra., 226 Conn. 753. In Holly Hill, buyers had actual knowledge of existing underground gasoline storage tanks and the existence of such tanks was held not to be a defense in a subsequent foreclosure action. In Gibson, buyers "were well aware that the property previously had been infested by termites and had been chemically treated by professionals." Id., 734. InGibson, the sellers accurately disclosed the condition, extent of the condition and the limited damage that had resulted. It appears that the seller's full knowledge was disclosed. "Where a party realizes he has only limited information upon the subject of a contract but treats that knowledge as sufficient in making the contract, he is deemed to have assumed the risk of a mistake." Id., 734. In this case the seller DeFrancesco did not inform the buyers of the true state of facts, extensive leaking. Minimal leaking was disclosed and the buyer not satisfied with the representation, conducted reasonably limited testing of the integrity of the tanks. Had the full and accurate facts been disclosed, the plaintiffs could have ended the deal or done more testing. The "as is" clause is not a defense to the defendant's breaches.
Paragraph 8(a) uses as one of its operative words, "maintenance." In a statutory environmental setting the word "maintain" has been held to be ambiguous. "The dictionary definitions of the word, "maintain," however, are themselves ambiguous, do little to rein in its inherently broad meaning, and can hardly be interpreted invariably to require the taking of affirmative action." Starr v. Commissioner of EnvironmentalProtection, 226 Conn. 358, 375 (1993). But paragraph 8(a) does not limit the parties equal contribution obligation to "maintenance." it covers repairs or replacement. The UST regulations required replacement. Thus, in the context of what actions were required to alleviate the UST condition, there is no ambiguity in the language of paragraph 8(a). The language of the paragraph 8(a) defines "maintenance" to include repair or replacement. The landlord and tenants shall share equally in the cost of any maintenance, repair or replacement of the underground storage tanks during the first five year period of the lease. It expected that the maintenance of the storage tank would be shared equally by both parties. The repair of the storage tanks would be shared by both parties. The cost of the removal of old storage tanks and their replacement with brand new more costly tanks should equally be shared by both parties. Furthermore, it is reasonable to assume that any damages that would flow from the act of replacement, such as possible soil contamination, would be CT Page 10725 reasonably considered within the ambit of paragraph 8(a). Paragraph 8(a), therefore, is clear and unambiguous. Both parties had a 50% obligation by contract for the first five years. Had it not been for paragraph 8(a) the defendants would be totally responsible.
The court finds that the plaintiffs conducted a reasonable pre-purchase inspection of the premises to determine if the tanks leaked or any UST was a problem. The entire area was asphalted and did not show any evidence of gasoline leakage or damage to the asphalt caused by petroleum contamination. The plaintiffs obtained a specific representation from the defendant at purchase in Exhibit 5 that no operating tanks leaked. The plaintiff paid for a tank test, which confirmed that no tanks were currently leaking. The disclosure by the defendant in Exhibit 5, paragraph 25, on the Sunoco capping related to an event that occurred before the defendant purchased the property and related to only one UST which was no longer in service. A major oil company was satisfied that the capping of the tank was a sufficient remedial measure. Contaminated soil was not a common experience in 1985. Even up to 1997, it was not customary for tenants to test for soil contamination prior to entering into possession. Both parties were ignorant of the law in 1985. The tank testing, purchase agreement and lease dealt with the subject. The testing done by the plaintiffs pursuant to Exhibit A, and other steps taken by the plaintiffs are sufficiently reasonable inspection. Although the plaintiffs could have tested in 1985 for soil contamination, this is hindsight. The court finds that it was not customary in 1985 for such soil contamination testing to be done.
This court finds that the soil contamination was a defect to the property which was (1) the result of deterioration due to old age; (2) existed on May 1, 1985, the beginning of the tenancy; (3) was not discoverable by the plaintiffs on reasonable inspection; and (4) was known either actually or constructively by the defendants. Thomas v. Roper, supra, 162 Conn. 349, 50.
Under CERCLA the responsibility to clean up environmental response costs can be passed from a responsible party to another, but only if the underlying agreement is sufficiently clear to find that such liability was transferred. Cornerstone Realty Inc.v. Dresser Rand Co., 17 Conn.L.Rptr. No 2, (U.S.D.C. May 16, 1996, Martinez, Magistrate, approved and adopted by Squatrito, J.) Both the owner of the land, the defendant, and the tenant in possession, the plaintiffs, are identified under state law as CT Page 10726 "owners" and "occupants." Regs., Conn. State Agencies §22a-449 (d)-1(a)(2). The phrase "removal of contaminated soil" does not appear in the lease. This court cannot conclude that the lease terms passed the liability clearly from one party to another.
The tenant's tendered their 40% obligation under paragraph 8 (a), but the landlord failed to pay her share. The landlord had inadequate monies to pay their share. Inadequate funds is not a defense justifying a breach of contract. The impossibility of performance defense cannot be applied to a landlord's financial inability to comply with negotiated lease terms. Barnett v.Barnett, 26 Conn. App. 355, 358-59 (1992) ("The defendant has furnished us with no Connecticut authority, nor are aware of any, that allows a party to avoid payment of a judgment [based on an agreement] on the basis of impossibility of performance due to lack of funds."); Straus v. Kazemekas, 100 Conn. 581, 592 (1924);Dills v. Enfield, 210 Conn. 705, 717-18 (1989); Sink v. MeadowWood Country Estates, Inc., 18 Conn. App. 569, 575-76 (1989). "As a general principal, difficulty or even improbability of accomplishment without financial loss will not release a party from his contract." Landscape Management Services, Inc. v.Farmington Plaza Associates, Superior Court, judicial district of Hartford-New Britain at Hartford, Docket No. 539633 (September 19, 1996, Lavine, J.). There is an implied covenant in every contract including a lease that the contracting party has sufficient ability to perform the terms of the agreement. PequotSpring Water Company v. Brunelle, 46 Conn. App. 187, 191-92
(1997).
The defendant has an obligation to perform the lease and has an implied duty of good faith and fair dealing. Warner v.Konover, supra, 210 Conn. 155-56 (Landlord's withholding of consent can be breach of landlord's implied covenant of good faith and fair dealing). The court concludes that the landlord did not have the money to pay for her share of the $62,000.00 tank replacement estimate. In order to cover up that fact, she countered by requiring the tenants to be obligated to pay a percentage of any soil contamination removal, even before any such fact was known to the parties. She made the demand knowing that she did not have the ability to pay for any portion of any soil removal costs. This act was in violation of the landlord's implied contract of good faith and fair dealing. Furthermore, when it became known after the tanks were removed that the soil contamination costs were beyond either parties' financial CT Page 10727 ability, it was bad faith for the landlord not to extend the terms of the lease and lower the rent to compensate for the tenants' payment of higher gasoline per gallon to a gasoline company who would have paid the money for the UST replacement including soil removal. The counter offer to the plaintiffs to buy out their lease for $25,000.00 was further evidence of her bad faith. The landlord knew prior to April 1985 of the fuel leaking of 100 gallons per day and did not advise the tenants of this fact. Having agreed to the testing agreement prior to the sale and lease, representing that one tank was capped by Sunoco and representing in the sales contract, Exhibit 5, paragraph 25, that during his occupancy of the premises no tanks or connection leaked or "indicated any loss of petroleum product," the seller assumed the duty of full and complete disclosure. The defendants are guilty of bad faith nondisclosure. Franchey v. Hannes,152 Conn. 372, 379 (1965). In a property dispute "a vendor may, under the circumstances, have no duty to speak, nevertheless, if he does assume to speak he must make a full and fair disclosure as to the matters about which he assumes to speak. He must then avoid a deliberate nondisclosure." Id., 379; see also Bernard v.Gershman, 18 Conn. App. 652, 656 (1989); Miller v. Appleby,183 Conn. 51, 56-57 (1981); Catucci v. Ouellette, 25 Conn. App. 56,59 (1991); Wedig v. Brinster, 1 Conn. App. 123, 130-31 (1983);Egan v. Hudson Nut Products, Inc., 142 Conn. 344, 348-49 (1955);Marchand v. Presutti, 7 Conn. App. 643, 645 (1986).
This court concludes that the following acts by the defendants are in violation of their duty of good faith and fair dealing under the April 25, 1985 lease and purchase agreements:
(1) They failed to accept the April 18, 1991 tender of the plaintiffs of $24,800.00 under paragraph 8(a) of the lease. The fifth year of the lease ended on April 25, 1990. The tender took place within the sixth year and thus the plaintiff only had a 40% responsibly for "maintenance, repair or replacement." Although the plaintiffs did not take the position, they may only have been responsible for 30% since the actual work by C P Excavating took place after April 25, 1991, the seventh year of the lease.
(2) They required the plaintiffs to pay 50% of the UST removal and replacement.
(3) They failed to notify the plaintiffs of the Board's Spring 1994 approval of clean up funds when there was a year to CT Page 10728 go in the lease, thus depriving the plaintiffs of the opportunity to have the Board release the funds prior to the end of the lease.
(4) They failed to extend the terms of the lease sufficiently to permit an oil company to recoup its soil contamination removal costs and to allow a new tenant to occupy the property.
(5) They failed to inform the plaintiffs prior to signing the lease that there were prior leaks of up to 100 gallons per day that had occurred, thus depriving the plaintiffs of the opportunity either not to lease the premises or negotiate terms that would assure removal of possible soil contamination.
(6) They offered $25,000.00 to buy the plaintiffs out of the lease in lieu of renegotiating the lease terms depriving the plaintiffs of their investment in capital improvements and recoupment of their $90,000.00 purchase price.
(7) They failed to arrange their financial affairs, including adjusting the terms of the April 25, 1985 lease, in order to be able to pay for the landlord's portion of the "maintenance, repair or replacement" of the USTs.
This court concludes that items (1), (2) and (3) of the prior paragraph are acts of the defendants that breached the terms of the April 25, 1985 lease.
The defendant claim that the plaintiffs have failed to mitigate their damages. The burden is on the party claiming damages to mitigate their damages. Rokalor, Inc. v. ConnecticutEating Enterprises. Inc., 18 Conn. App. 384, 390 (1989). The defendant argues the following: (1) The plaintiffs are "operators" of USTs and had a right to apply along with the defendant for to the Underground Storage Tank Petroleum Clean Up Fund in 1991 and they failed to do so. The answer is that the plaintiffs reasonably relied on the defendant's commitments to make such a filing. The defendants filed twice and eventually were approved in the Spring of 1994. Only when the Board changed its policy in the Spring of 1995 to advance funds instead of reimbursing funds already expended by an applicant, could the site be cleaned; (2) The plaintiffs could have closed up the business in 1991. The answer is that the plaintiffs would have lost their capital and labor investment in the business as well as the $90,000.00 purchase price. Closing the business was not a CT Page 10729 reasonable option and no doubt could have increased the damages actually sustained; (3) The plaintiffs could have accepted the defendant's $25,000.00 offer to purchase the lease in June 1991. This would have caused the same loss for the plaintiffs as in the second reason but lessened the damages by $25,000.00. The plaintiffs losses even under the $25,000.00 offer could have exceeded the amount claimed in this case; (4) The plaintiffs could have sold the business. The answer is that they attempted to do just that to no avail. The plaintiffs' attempts to sell the business were thwarted by the defendant's failure to deal with the plaintiffs in good faith; (5) The plaintiffs should have paid all the money for the clean up and tank replacement. The evidence discloses that neither of the parties had the over $100,000 to accomplish this effort; (6) The plaintiffs could have deducted their losses from the rent or note payments pursuant to paragraph 13 of the lease. This would subject them to an eviction at any moment thereafter; and (7) The plaintiffs could have deducted the costs from the rent or note payments due under paragraph 5 of the tank testing agreement, Exhibit A. The answer is that the plaintiffs sought and obtained a court ordered rent abatement effective August 1, 1991. Any unilateral further withholding of rent would no doubt have been met with an eviction action in which the plaintiffs could have lost their entire investment with little or no later financial recourse from the defendant. By 1991 the full purchase price had been paid. For all these reasons, this court finds that the plaintiffs have met their mitigation obligation.
The court finds that breach of contract and breach of the implied covenant of good faith and fair dealing use the same measure of damages, lost profits from gasoline sale plus attorney fees under paragraph 41 of the lease. "The measure of damages ordinarily is the amount which the lessor would have received from his share of the proceeds of the business had the lessee operated it in its usual and customary manner." Pequot SpringWater Co. v. Bunelle, supra, 46 Conn. App. 198.
"It is axiomatic that the burden of proving damages is on the party claiming them. When damages are claimed they are an essential element of the plaintiffs proof and must be proved with reasonable certainty. Damages are recoverable only to the extent that the evidence affords a sufficient basis for estimating their amount in money with reasonable certainty. Although damages often are not susceptible of exact pecuniary computation and must be left largely to the sound judgment of the trier this situation CT Page 10730 does not invalidate a damage award as long as the evidence afforded a basis for a reasonable estimate by the [trier] of that amount. . . . Mathematical exactitude in the proof of damages is often impossible, but the plaintiff must nevertheless provide sufficient evidence for the trier to make a fair and reasonable estimate." (Citations omitted; internal quotation marks omitted.)24 Leggett St. Limited Partnership v. Beacon Industries, Inc.,
supra, 239 Conn. 308-09.
The court finds that the defendant's breach of lease and breach of the implied covenant of good faith and fair dealing each are the proximate cause of the damages of lost profit and attorney fees claimed by the plaintiffs. Abrahams v. Young Rubicam, Inc., 240 Conn. 300, 306 (1997).
The court further finds that the plaintiff sustained a substantial loss of profit in the manner shown in Exhibit 9. Neil Berkow, CPA, testified for the plaintiffs in support of their damage claims. He allocated the entire business overhead: insurance, utilities, taxes, employees, fringe benefits, advertising, refuse, rent and repairs, to the automotive repair section of the business. Thus, he only considered the gasoline sales profit as gross sales less the cost of the product. He testified that fixed costs should not be allocated to gasoline sales. He offered no accounting standard to support this testimony. Prior to the discontinuance of gasoline sales, fixed costs were deducted from both gasoline sales and automotive repairs. The plaintiffs had a full time employee whose duty was to pump gasoline. One of these employees testified at trial.
The evidence showed that the sale of gasoline from the pump as well as oil would have attendant costs in addition to the cost of the product. Water was needed to wash windshields and to keep the construction dust down. The pumps were run by electricity. The gasoline area was lighted and it operated after dark especially in winter. A large land area was needed to fill automobiles with gasoline, larger than the automotive repair area. Insurance should be prorated accordingly. Employees had to tend to full service pumps, check under the hood, provide oil and water for the engine. The gasoline and other purchases had to be paid by customers who did not use charge cards directly at the pump. Substantial employment, utility and insurance costs must be subtracted from gasoline sale. See tax returns of plaintiffs for breakdown of business expenses. Exhibits F, G, H, I, J, K, L, M, and N. CT Page 10731
The plaintiffs produced Exhibit 9 at trial, a listing of the fuel profit for the years 1986, 1987, 1988, 1989, and 1990. The plaintiffs always kept separate accounting records of automobile repairs and fuel sales. Fuel sales net after cost of product in Exhibit 9 are as follows: There was a low of $29,532.26 in 1986 and a high of $49,732.13 in 1989. The total net fuel sales for five years was $196,407.00, divided by the 60 months, yields an average net gasoline sales profit of $3,273.00 per month. The plaintiffs first sold gasoline in May 1985 and last sold in mid March 1991. These five years. 1986-1990, represent the only complete calendar years. The plaintiffs vacated the premises when the second five year option expired on April 30, 1995. The plaintiffs have claimed a loss of gasoline sales profit of $3,273.00 per month from mid March 1991 until April 30, 1995; 49.5 months for a total claim of $162,013.00. The court accepts this claim as proven.
The plaintiffs admit that the defendant is entitled to certain credits from that sum. The rent of $2,700.00 per month was reduced effective September 1, 1991 to $1,500.00 per month, a saving of $1,200.00 per month. The next rent increase was a cost of living increase effective May 1, 1992. Thus, the defendant is entitled to an eight month credit of $9,600.00. The monthly rent for May 1, 1992 until April 30, 1995 would have been $3,000.00, thus generating a savings $1,500 per month for those 36 months. This results in an additional credit to the defendant of $54,000.00. The plaintiffs tendered and owed $24,800 representing 40% of the $62,000.00 C P Excavating cost of the UST removal, a tender not accepted by the landlord. The defendant is entitled to an additional $24,800.00 credit, pursuant to paragraph 8(a) of the lease. These three credits, $9,600.00, $54,000.00 and $24,800.00, total $88,400.00. Subtracted from the $162,013.00, it leaves the plaintiffs' damage claim at $73,613.00. From that twenty-five (25%) percent for a portion of fixed costs for employees pumping gas, related utilities and costs of $40,500.00 should be subtracted leaving a net claim of $33,113.00. This pro rating of the overhead costs to gasoline sales amounts to less than $10,000, a modest sum based on the testimony and information in the tax returns, to pay for labor, fringe benefits, utilities, insurance and other costs associated with the delivery of fuel products to customers.
To this sum the plaintiffs wish to add attorney fees pursuant to paragraph 41 of the lease. "Additionally, in the event that it CT Page 10732 becomes necessary for the Tenant to institute a civil action to obtain performance of those obligations of the Landlord hereunder, or because of the breach of any of the Landlord's obligation, the Landlord shall pay, upon demand, all of Tenant's reasonable costs, charges and expenses, including the fees of counsel, agents and others retained by the Tenant, which were incurred in connection with the recovery of sums or performance of such duties under this Lease." This is based on the following: Exhibit 11, attorney A.J. Barr, their initial attorney $5,902.82; Exhibit 10, for trial attorney Melvin Blumenthal $21,623.60 as billed and a projected $3,000 to conclude the trial; and Exhibit 16, Attorney Blumenthal's September 1997 affidavit for attorney fees from June 24, 1996 through September 3, 1997 in the amount of $36,047.79. The claimed attorney fees from these three exhibits total $41,950.61. The plaintiffs' October 17, 1997 Memorandum claims $41,977.61 as attorney fees. By adding the lesser sum of attorney fees to the total lost profit claim found by this court after credits, the plaintiffs requested damages are $33.113.00 net lost profit and $41,950.61 attorney fees for a total of $75,063.61.
The court heard a number of pretrial motions, reviewed the entire file and heard the evidence. Where the amount of attorney fees sought is based on a contractual provision, courts may rely upon their general knowledge of what has occurred in the proceedings before them to supply evidence in support of an award of attorney fees. Bizzoco v. Chintz, 193 Conn. 304, 310 (1984). Exhibits 11 and 16 do not contain contemporaneous time records broken down for each day. There is no itemization of hours contained in Exhibit 11 and 16. Tedesco v. City of Stamford,24 Conn. App. 377, 384 (1991). Only attorney's fees, not clerical or paralegal time, should be awarded. Mr. Barr's hourly rate of $175 from April 1991 to December 1992 is excessive. Mr. Blumenthal billed $200 per hour. This is excessive, more so in the first year. Since counsel was replaced well into this litigation, additional time spent for new counsel to review the file should not be billed. Hours were spent on unnecessary, irrelevant and duplicative discovery matters. The court reviewed the twelve guidelines for the award of attorney fees in Steiger v. J.S.Builders, Inc., 39 Conn. App. 32, 38 (1995) as well as Rule 1.5 of the Rules of Professional Conduct. The court has reviewed Exhibits 10, 11 and 16, the attorney fees affidavits, in detail. Based on all of the above considerations, this court awards attorney fees to the plaintiffs in accordance with paragraph 41 of the April 25, 1985 lease in the amount of $22, 000 exclusive CT Page 10733 of court costs. Connecticut National Bank v. Brown, Superior Court, judicial district of Stamford-Norwalk, Docket No. 107084 (August 14, 1992, Mottolese, J.).
Thus, the plaintiffs are entitled to damages for net lost profits of $33.113.00, plus reasonable attorney's fees of $22,000.00.
The plaintiffs' amended Claim for Relief dated June 17, 1996 requests interest on the damages and attorney fees. The lease contains no agreement as to the rate of interest or the awarding of interest. No offer of judgment was filed. "Interest at the rate at ten per cent a year, and no more may be recovered and allowed in civil actions . . . as damages for the detention of money after it becomes payable." General Statutes § 37-3a. The issue of awarding interest is "whether the detention of the money is or is not wrongful under the circumstances." Cecio Bros.Inc. v. Feldmann, 161 Conn. 265, 275 (1971). Under the facts of this case with both parties having insufficient financial ability to remove the soil contamination and the Board not advancing clean up funds until early 1995, this court cannot find "wrongful detention" even though the defendants both breached the lease and their implied duty of good faith and fair dealing.
Therefore, judgment will enter in favor of both plaintiffs, jointly and severally, as against both defendants, jointly and severally, in the amount of $55,113.00. Costs are awarded to the plaintiffs.
SO ORDERED.
TIERNEY, J.