# PEQUOT SPRING WATER COMPANY *v.* DORIS G. BRUNELLE ET AL.
## (AC 15993)

Dupont, C. J., and Hennessy and J. Kaplan, Js.

Argued March 20—officially released August 12, 1997

*James G. Green, Jr.*, with whom was *Richard F. Wareing*, for the appellants (defendants).

*Francis J. Brady*, with whom, on the brief, was *Everett E. Newton*, for the appellee (plaintiff).

*Opinion*

DUPONT, C. J. The defendants, Doris G. Brunelle (Brunelle)[1] and Doris G. Brunelle, trustee, appeal from the trial court's rendering of a declaratory judgment in favor of the plaintiff, the Pequot Spring Water Company (Pequot). Pequot sought an interpretation of the rent provisions of a long-term percentage rent lease between Pequot and Brunelle. The defendants counterclaimed, seeking a declaratory judgment[2] that a breach of an implied covenant "to deal fairly" and "act in good faith," would result if Pequot ceased operations on the leased premises or stopped paying a minimum monthly rental payment of $4000.[3] In its declaratory judgment, the trial court determined that no minimum rent was due to Brunelle and that the lease did not prohibit Pequot from selling its business, thereby ceasing operations on the premises and causing its gross sales to be reduced to zero so that no rent would be due to Brunelle.

Until 1984, Brunelle was the owner of Pequot.[4] In 1984, Brunelle transferred her majority interest in the

---

[1] Unless otherwise noted, as used in this opinion, "Brunelle" refers to Doris G. Brunelle in her individual capacity.

[2] Practice Book § 391 (e) provides: "The defendant in any appropriate action may seek a declaratory judgment by a counterclaim."

[3] The defendants, in their answer, also asserted the special defenses of promissory estoppel, fraud, estoppel and mistake.

[4] Brunelle's father founded the company in the 1940s as a soft drink business with a side line of bottling the water from a spring located on the property. Brunelle took over the company in 1964. Eventually Pequot's focus shifted to the bottling and sale of spring water and the rental and sale of water coolers. Doris G. Brunelle conveyed her interest in the real estate and the lease to Doris G. Brunelle, trustee, on September 14, 1990.

stock of Pequot to the shareholders of Pequot. Brunelle retained ownership of the bottling plant and the natural spring used by Pequot to produce bottled water. The parties agreed that Brunelle would lease the plant and the spring to Pequot for a period of twenty-five years, as an extended term,[5] which commenced on July 1, 1984. In return, Pequot would pay Brunelle rent calculated by a percentage of its gross sales.[6] Two subsequent amendments to the lease, dated June 29 and 30, 1984, further specified the terms of the payments due under the lease.[7] In addition, Pequot was to pay all taxes and assessments on the property and to pay for utilities,

[5] The lease had been in effect from July 1, 1980 to June 30, 1984, when, in accordance with paragraph 4 of the lease, Doris Brunelle divested herself of a majority interest in Pequot Spring Water Company, and the extended term began.

[6] The relevant paragraph of the lease, paragraph five, states as follows: "Rental During Extended Term: Lessee shall pay to Landlord as annual rental for the demised premises during the extended term a sum equal to six (6%) percent of the first FIVE HUNDRED THOUSAND ($500,000) DOLLARS of Lessee's annual gross sales plus, if applicable, a sum equal to five (5%) percent of the next TWO HUNDRED THOUSAND ($200,000) DOLLARS of Lessee's annual gross sales, plus, if applicable, a sum equal to four (4%) percent of the next THREE HUNDRED THOUSAND ($300,000) DOLLARS of Lessee's gross sales plus, if applicable a sum equal to three (3%) percent of the next FIVE HUNDRED THOUSAND ($500,000) DOLLARS of Lessee's gross sales in excess of ONE MILLION FIVE HUNDRED THOUSAND ($1,500,000) DOLLARS.

"The percentage rent period shall be semiannual and the rent shall be computed each percentage rent period. The last percentage rent period shall end on the date the term expires or otherwise terminates. Semiannual rent periods are periods within each lease year ending on June 30 and December 31, whether or not consisting of six (6) months. On or before the tenth (10th) day of the calendar month immediately following the close of each percentage rent period, lessee shall pay to landlord the percentage rent as defined herein."

[7] Paragraph 2 (a) of the first amendment provides: "Extended Term Rental Payments (a) Commencing on July 1, 1984, Lessee shall pay to the Lessor the sum of FOUR THOUSAND AND NO DOLLARS ($4,000.00) on or before the tenth (10th) day of each calendar month, to be applied against the amount of rent due Lessor pursuant to Paragraph 5 of the Lease."

Paragraph 2 (e) of the first amendment provides: "The monthly payment set forth in Paragraph 2 (a) hereof shall be adjusted on June 30, 1985, and

repairs, maintenance and insurance (triple net charges). Annual rents from 1990 to 1995 totaled between $75,000 and $85,000.

In 1994, Brunelle discovered that Pequot intended to sell its business to Suntori, doing business as Belmont Springs Water Company (Suntori), and to terminate its operations. The agreement between Pequot and Suntori provided for a sales price of over two million dollars. Pequot claimed that, once it ceased operations, it would no longer owe Brunelle any rent because its gross sales, the base on which rent was calculated, would have dropped to zero. Brunelle argued that the lease provided for a minimum monthly rent of $4000, or, alternatively, that Pequot had a good faith duty to continue operating the company for the full term of the lease.

In January, 1995, Pequot sought a judgment declaring that, if its gross sales fell to zero upon the sale of its assets to Suntori and the termination of operations, it would owe no rent[8] to Brunelle for the remaining period

on each anniversary date thereof, for so long as this Lease shall remain in force and effect, in order that the monthly payments for each year shall be based upon computation of the previous year's actual annual gross sales."

Paragraph one of the second amendment provides: "Commencing on June 30, 1985, and on each anniversary date thereof throughout the term of the Lease, an adjustment shall be made so that the rent paid by Lessee to Lessor over the previous twelve month period shall equal the rent actually due Lessor for said period, pursuant to Paragraph 5 of the Lease. In the event that the rent due Lessor exceeds the amount paid by Lessee during said period, then the amount of such excess rent due Lessor shall be added to the amount of the next monthly payment. In the event that the amount of rent paid by Lessee exceeds the rent due Lessor for said period, then Lessee shall deduct from its next monthly rental payment the amount of said excess payment, provided however, that in the event that the excess payment exceeds the amount of rent due Lessor for the next monthly payment, the excess over the amount of the next monthly payment shall bear interest at the rate of 10% per annum commencing upon the adjustment date, unless Lessor pays the amount of such excess payment to Lessee prior to the date of the next monthly payment."

[8] Pequot acknowledged that it would still owe Brunelle the triple net charges.

of the lease. On May 10, 1996, the trial court rendered judgment in favor of Pequot, holding that: "1. The calculation of rent due to Doris G. Brunelle and/or Doris G. Brunelle, Trustee, is to be computed according to the formula set forth in Paragraph Five of the original lease . . . 2. The lease [and amendments] do not provide for a minimum rent to be paid to Doris Brunelle by Pequot; and 3. The lease documents do not prohibit Pequot from selling its business, thereby reducing its gross sales to zero so that no rent would be due to Doris Brunelle."

Brunelle, in her individual capacity and as trustee, appealed, claiming that the trial court improperly (1) held that the lease did not contain an implied covenant obligating Pequot to operate on the premises during the entire term of the lease, (2) failed to find, under the doctrine of equitable estoppel, that the lease contained a minimum monthly rent of $4000, and (3) failed to find that under the doctrine of mistake the lease contained a minimum monthly rent of $4000.[9]

Although Connecticut appellate courts have not yet considered whether and under what conditions a percentage lease may be deemed to contain an implied covenant to continue to operate and generate sales for the duration of a lease, other jurisdictions have considered the subject. We conclude, as do cases from other jurisdictions, that, under appropriate language in a lease and appropriate circumstances, such an implied covenant may exist. We, therefore, analyze the lease of the parties against the backdrop of those cases.

"In agreements where the rental is based either upon a straight percentage of sales, or upon a minimum fixed

---

[9] In view of our decision on the defendants' first claim and the reasoning used to reach that decision, it is not necessary to reach her second and third claims. We agree with the trial court that the lease did not provide for a minimal monthly rent of $4000, and we agree with the trial court's logical reasoning as to the claims involving equitable estoppel and mistake.

rental and additional rental based upon a percentage of sales, the inadequacy of the base rent implies a covenant of continuous operation." *First American Bank & Trust Co.* v. *Safeway Stores, Inc.*, 151 Ariz. 584, 586, 729 P.2d 938 (1986); see also *Lippman* v. *Sears Roebuck & Co.*, 44 Cal. 2d 136, 143, 280 P.2d 775 (1955); *Fox* v. *Fox Valley Trotting Club*, 8 Ill. 2d 571, 573, 134 N.E.2d 806 (1956); *Simhawk Corp.* v. *Egler*, 52 Ill. App. 2d 449, 454, 202 N.E.2d 49 (1964); *East Broadway Corp.* v. *Taco Bell Corp.*, 542 N.W.2d 816, 819 (Iowa 1996); *Fashion Fabrics of Iowa, Inc.* v. *Retail Investors Corp.*, 266 N.W.2d 22, 28 (Iowa 1978); *Stop & Shop* v. *Ganem*, 347 Mass. 697, 703, 200 N.E.2d 248 (1964); *Worcester-Tatnuck Square CVS, Inc.* v. *Kaplan*, 33 Mass. App. 499, 601 N.E.2d 485 (1992); *Kretch* v. *Stark*, 26 Ohio Op. 2d 385, 393, 193 N.E.2d 307 (Court of Common Pleas 1962). Courts consider several factors to determine whether a covenant to remain in business will be implied: "(1) whether base rent is below market value, (2) whether percentage payments are substantial in relation to base rent, (3) whether the term of the lease is lengthy, (4) whether the tenant may sublet, (5) whether the tenant has rights to fixtures, and (6) whether the lease contains a noncompetitive provision." *Lagrew* v. *Hooks-SupeRx, Inc.*, 905 F. Sup. 401, 405 (E.D. Ky. 1995). We adopt the factors of *Lagrew* in order to determine whether there is an implied covenant to continue to remain in business.

The first factor of *Lagrew* concerns the base rent. If the base rent is below market value, one of the conditions for implying a covenant of continued operation is present. The reason for the applicability of this factor in relation to the implied covenant is that the amount of minimum rent can be tested by a trier to determine its adequacy. If it is adequate, there would be no basis for implying a covenant to continue operations in order to generate rent. Here, the $4000 rental payment as

provided in paragraphs 2 (a) and (e) of the first amendment to the lease is not a base payment but, rather, a payment "to be applied against the amount of rent due Lessor . . . ." Here, because the lease provided for no minimum rent payment, the base rent is "below market value" and meets the first factor of *Lagrew*. The second factor of *Lagrew* is whether the percentage payments are substantial in relation to base rent payments. Because there are no base rent payments at all, the percentage payments are obviously substantial when compared with a base rent of zero.

The third test of *Lagrew*, the fact that the term of the lease is lengthy, is true here. At the time of trial, thirteen years remained in a twenty-five year lease. The length of the term is indicative of the parties' intention that Pequot remain in business. Pequot would not have entered into a lease with such a length and Brunelle would not have accepted rental payments based solely on Pequot's sales if both parties had not intended that Pequot remain in business for the full length of the lease.

The fourth *Lagrew* factor is whether the lease contains a subletting provision. In the Pequot-Brunelle lease, the right to enter a sublease is limited.[10] Pequot argues that the provision is indicative of the intent that the parties did not contemplate continuous operation by the lessee. The fact that Brunelle retained the right to refuse a sublease implies, however, that a suitable

---

[10] The subletting clause of the lease provides: "Assignment of Sublease. Lessee shall not assign this Lease nor sublet the premises without the written consent of the Lessor, which consent shall not be unreasonably withheld; it being understood, however, that the Lessee may, at any time, assign this Lease or sublet all or any part of the premises to a corporation or corporations in which the Lessee is the holder of a majority of said corporation's issued and outstanding voting stock; and further, that the Lessee may sublet roof-top space or facilities for advertising purposes, subject to reasonable requirements of the Lessor. But no assignment or subletting shall release the Lessee from the performance of its obligations herein contained, and Lessee shall remain fully liable under this Lease."

replacement business would occupy the bottling plant. "Thus, a more precise statement of the implied covenant is that the lessee, or some suitable sublessee, will continuously operate on the premises." *Lagrew* v. *Hooks-SupeRx, Inc.*, supra, 905 F. Sup. 406; see also *First American Bank & Trust Co.* v. *Safeway Stores, Inc.*, supra, 151 Ariz. 586; *East Broadway Corp.* v. *Taco Bell Corp.*, supra, 542 N.W.2d 820.

The fifth characteristic of an implied covenant to remain in business concerns the right of a lessee to remove fixtures from the leased premises. Although Pequot has rights in the fixtures,[11] this fact does not negate any implication of a covenant of continuous operation. In this case, Pequot as lessee was also the owner of the fixtures under the stock purchase agreement. "While a term requiring accession of fixtures would present stronger evidence that the parties intended the lessee to continuously operate on the premises, the absence of such a term does not necessarily prove the converse." *Lagrew* v. *Hooks-SupeRx, Inc.*, supra, 905 F. Sup. 407.

The sixth factor of *Lagrew*, whether a noncompetition provision exists, does not fit the factual situation here. Most of the cases involving percentage leases involve space in shopping centers, a situation where a lessee is likely to bargain for a provision in a lease that the lessor will not lease to a competitor in that shopping center or the surrounding area. Here, where the business is tied to a spring, which is part of the leased premises, there is no necessity for such a noncompetition provision.

In *Lagrew* v. *Hooks-SupeRx, Inc.*, supra, 905 F. Sup. 404, the plaintiff-lessors claimed an implied covenant

---

[11] The lessee is permitted by the terms of the lease to remove fixtures from the leased premises.

of continuous operation existed "because such a provision is necessarily involved in the contractual relationship so that the parties must have intended it and only failed to express it because of [sheer] inadvertence or because the provision was too obvious to need expression." The court considered the six factors mentioned above before holding that "[w]ithout an implied covenant of continuous occupation by the lessee or a suitable sublessee the entire agreement is nonsensical. The implied covenant of continuous operation is necessary to effectuate the true intentions of these parties." Id., 407–408.

After a consideration of the factors involved in determining whether the lease of the parties contains an implied covenant to continue to operate and generate sales for the duration of the lease, we conclude that it does. The implied covenant is necessary to a rational understanding of this lease.

Having determined that the lease contains such an implied covenant, we next consider whether the scope of our review can include a resolution of the relief that may be afforded on the defendants' counterclaim for a declaratory judgment. We conclude that we may determine, for the trial court's guidance on remand, how to measure damages if Pequot ceases operations on the leased premises.

Declaratory judgment actions are governed by General Statutes § 52-29 and Practice Book § 391. General Statutes § 52-29 (a) provides that the Superior Court "may declare rights and other legal relations on request for such a declaration, whether or not further relief is or could be claimed." Section 52-29 (b) further provides that "[t]he judges of the superior court may make such orders and rules as they may deem necessary or advisable to carry into effect the provisions of this section."

Practice Book § 391 (b) provides that, in actions seeking a declaratory judgment, "no claim for consequential relief need be made." Our Supreme Court has recognized that the declaratory judgment statute should be liberally construed. See *Middlebury* v. *Steinmann*, 189 Conn. 710, 716, 458 A.2d 393 (1983). Indeed, § 52-29 "is broader in scope than [the Uniform Declaratory Judgments Act] and the statutes in most, if not all, other jurisdictions." *Horton* v. *Meskill*, 172 Conn. 615, 626–27, 376 A.2d 359 (1977).

The declaratory judgment procedure in Connecticut "has the distinct advantage of affording to the court in granting any relief consequential to its determination of rights the opportunity of tailoring that relief to the particular circumstances." Id., 627. The relief afforded in a declaratory judgment action "is highly remedial and the statute and rules should be accorded a liberal construction to carry out the purpose underlying such judgments." *Bania* v. *New Hartford*, 138 Conn. 172, 175, 83 A.2d 165 (1951).

In *Sheff* v. *O'Neill*, 238 Conn. 1, 678 A.2d 1267 (1996), a declaratory judgment action seeking a declaration regarding equal educational opportunity in our public schools, our Supreme Court rendered judgment for the plaintiffs on the merits. The court was then faced with the question of what sort of relief it could properly afford to the plaintiffs. In their prayer for relief, the plaintiffs in *Sheff* did not focus on appropriate remedial consequences in the event of judgment in their favor. See id., 45. Under these circumstances, the court determined that it had three options, one of which was to remand the case to the trial court for further proceedings. Id. This is the course that we choose to take.

In light of our judgment for the defendants, the trial court on remand will need to determine the consequential relief owing to the defendants if Pequot ceases

operations on the leased premises. In an action for declaratory judgment, the court is "not limited by the issues joined or by the claims of counsel." *Bania* v. *New Hartford*, supra, 138 Conn. 175. Thus, "monetary relief may be granted to [the] party so entitled in proceedings for declaratory judgment, even though relief was not requested in [the] pleadings." 22A Am. Jur. 2d 887, Declaratory Judgments § 246 (1988). That principle was employed in *McNally* v. *Moser*, 210 Md. 127, 141, 122 A.2d 555 (1956), a declaratory judgment case factually similar to the one before us. In *McNally*, the plaintiffs sought a declaratory judgment that the premises in question were leased to the defendants for a period of ten years, thus preventing the defendants from vacating the premises and ceasing to pay rent after only four years. The court of appeals upheld the trial court's decision rendering judgment for the plaintiffs and granting them relief in the form of rent due on the leased premises, even though the plaintiffs did not pray for such relief in their petition for declaratory judgment. See id., 140–41.

The defendants in the present case alluded in their counterclaim to what they believed was the amount of monthly rent due to them.[12] In view of the broad scope of § 52-29 and Practice Book § 391, we conclude that the allegations of the defendants' counterclaim make it appropriate for us to determine how to measure the defendants' damages.

___

[12] The defendants' counterclaim for a declaratory judgment requested settlement of the following questions:

"a. whether it would be a breach of the implied covenant of good faith and fair dealing contained in the Lease, as amended, for Pequot to cease operations of the Premises during the Extended Term, absent bankruptcy; and

"b. whether it would be a breach of the implied covenant of good faith and fair dealing in the Lease, as amended, for Pequot to cease paying the minimum monthly rental payment of $4,000.00 per month during the Extended Term, absent bankruptcy."

"For breach of an implied covenant to remain in business, the measure of damages ordinarily is the amount which the lessor would have received from his share of the proceeds of the business had the lessee operated it in its usual and customary manner." *Lippman* v. *Sears Roebuck & Co.*, supra, 44 Cal. 146. In most of the cases in which the lessor was victorious under this theory, the lessee had moved to another location and was still in operation. The courts could, therefore, award damages under the lease by awarding a percentage of the sales of the company at its new location. See *Simhawk Corp.* v. *Egler*, supra, 52 Ill. App. 2d 454–55. Here, where the company will no longer be in business, this remedy is not available.

Some courts have treated the remedy of damages as arising from a breach of an implied covenant to pay a reasonable rent during the term of a lease rather than arising from a breach of an implied covenant to continue to operate a business on the premises. *Bastian* v. *Albertson's, Inc.*, 102 Idaho 909, 914, 643 P.2d 1079 (1982); see also *Sinclair Refining* v. *Davis*, 47 Ga. App. 601, 605, 171 S.E. 150 (1933). Any implied covenant to pay a reasonable rent is "a subspecies of a covenant of continuous operation." *Lagrew* v. *Hooks*, supra, 905 F. Sup. 408. We agree that a covenant of continuous operation contains within it the subsidiary promise to pay a reasonable rent. The damages, thus, are the fair rental value of the premises during the time of the breach. Id.; *Bastian* v. *Albertson's, Inc.*, supra, 914. The dollar value of that amount is a question of fact.

The judgment for Pequot is reversed and the case is remanded with direction to render judgment for the defendants on their counterclaim, declaring that the lease and amendments to the lease contain an implied covenant to continue operations on the leased premises, and to hold a hearing to determine the amount of damages due to the defendants.

In this opinion the other judges concurred.